## Kentucky Title Savings Bank & Trust Company v. Day.

(Decided February 20, 1917.)

### Appeal from Jefferson Circuit Court
### (Chancery Branch, First Division).

1. **Contracts—Sale of Capital Stock of Corporation—Appraisement.—** Where a contract for the sale of a majority of the capital stock of a corporation provided that the purchaser should pay therefor $26.00 per share, "plus the value of the stock as the same exists on this day as fixed and determined by an appraisement" by named appraisers, "such appraisement not to include any sum for franchise, good will or earning power," and that the list should be thereafter made by the appraisers, so as to include only the assets representing capital stock, surplus and undivided profits; Held, that the contract provided for a sale at the real value of such stock, as determined by the appraisers from the list to be prepared, and the contract provision, that the list should be confined to the assets representing capital stock, surplus and undivided profits, which amounted to only about $530,000.00, from which the approximate sum of $245,000.00 should be realized before participation in the proceeds of the listed assets, by the sellers, was simply directory to the appraisers, of the method for their appraisement, and, that where the appraisers, in the list made, included assets amounting to about $753,000.00, from which $422,000.00 should be

realized before participation by the sellers, showing clearly that the list contained assets other than capital, surplus and undivided profits, neither party having objected to the appraisement thus made, both parties are bound by it in its entirety, and before the sellers are entitled to participate in the proceeds of the assets thus listed by the appraisers, the sum fixed by them must be realized, and one party to the contract may not use part of the appraisement, and disregard another part thereof, so as to bring about a result clearly not contemplated by the contract.

2. Contracts—Sale of Capital Stock of Corporation.—The purchaser, having simply assigned without recourse, any share in the excess of the listed assets that might ultimately be found to be due the stock sold, is not personally liable to the sellers for any portions of these assets, except for such ascertainable benefits as it may have received therefrom, over and above the amount charged thereto by the appraisers.

3. Corporations—Sale of Stock in National Bank.—The sale of the controlling interest in the stock of a national bank, does not convey the assets, nor does it destroy the identity of the bank, or render the purchaser liable, beyond the express terms of the contract, for the acts of the bank, even though the officers of the purchasing corporation and the bank are identical.

HUMPHREY, MIDDLETON & HUMPHREY and BRUCE & BULLITT for appellant.

GIBSON & CRAWFORD for appellee.

Opinion of the Court by Judge Clarke—Reversing.

Appellee, on September 18th, 1909, sold to appellant three hundred and twenty shares of the capital stock of the First National Bank of Louisville, upon the same terms as appellant had, on September 4th, 1909, by written contract, acquired from the Fidelity Trust Company, as trustee of other owners of stock of the said bank, a majority of said stock, except that the $40.00 and the $26.00 per share, a total of $66.00, was paid appellee in cash, for his stock, whereas only $40.00 per share was paid in cash, by appellant, for the stock purchased from the trust company, the payment of the additional $26.00 per share for the trust company stock being subject to certain conditions not involved here. So that, with this single exception, the contract of September 4th, 1909, between the trust company and appellant, is the basis of this transaction, and we shall, first, attempt an analysis of that contract, which is as follows:

This Agreement made this 4th day of September, 1909, by and between Fidelity Trust Company herein-

after called the trust company party of the first part, and Kentucky Title Savings Bank & Trust Company hereinafter called the savings bank party of the second part:

Witnesseth:

1. The First National Bank of Louisville hereinafter called the bank is a national bank with $500.00.00 capital stock which is greatly impaired, and the controller of the currency has insisted that the impairment must be promptly made good either by, (1) An assessment on the shareholders under U. S. Rev. Statutes, 5205, or, (2) a reduction of the capital stock, or that the bank shall go into voluntary liquidation.

2. A number of shareholders of the bank have deposited with the trust company with power to sell the same at such price and upon such terms as it deems best, the following securities, to-wit:

(1) Stock.

(2) Voting trust certificates in respect of such stock under a voting agreement dated February 1, 1906.

(3) Collateral trust bonds covering such voting trust certificates under a trust agreement between C. C. Bickel, et al., and the United States Trust Company dated May 2nd, 1908.

3. Under the terms of the trust agreement dated May 2, 1908, voting trust certificates in respect of 1,088 shares of stock in the bank were deposited with the United States Trust Company as trustee, to secure the payment of $136,000.00 par value of collateral trust bonds dated May 2, 1908, executed by C. C. Bickel, E. H. Ferguson, C. C. McClarty, and Geo. M. Boone to "bearer;" each of which makers deposited voting trust certificates in respect of 272 shares of bank stock.

The entire issue of $136,000.00 par value of said bonds has been deposited with the trust company and Messrs. Bickel, Ferguson and McClarty have requested the United States Trust Company to surrender the voting trust certificates in respect of 1,088 shares of bank stock which it has refused to do (without the consent of Geo. M. Boone) until the maturity of the bonds on May 2, 1910, or until the lien of the pledge shall be foreclosed, upon the ground that until such time the said Boone has the right to redeem the said voting trust certificates in respect of 272 shares of stock upon the payment of $34,000.00 par value of said bonds.

4. The savings bank is willing to purchase all the stock and voting trust certificates in respect of such stock represented or covered by the securities deposited with the trust company at the rate of $26.00 per share of stock, plus the value of the stock per share as the same exists on this day as fixed and determined by an appraisement by John W. Barr, Jr., and H. C. Rodes; such appraisement not to include any sum for franchise, good will or earning power.

5. It is contemplated that on September 4, 1909, the capital stock of the bank will, by the vote of its shareholders, be reduced to $200,000.00.

If from those of its assets which are taken as representing its capital stock, surplus and undivided profits there shall be realized anything above approximately $245,000.00 in cash, then such assets or the proceeds thereof (after realizing approximately $245,000 in cash) shall be deemed as set.free by the reduction of the capital stock, and shall be subject to distribution among the shareholders of the bank.

Now, therefore, it is agreed between the parties hereto as follows, to-wit:

### Article One.

The trust company will on September 4, 1909, deliver to the savings bank the following securities, to-wit:

1. Certificates for 850 shares of the fully paid capital stock of the First National Bank of Louisville.

2. Voting trust certificates in respect of 924 shares of such capital stock, all properly made out in the name of the savings bank, or in the name of such person or persons as it may designate.

3. Collateral trust bonds of the par value of $136,-000.00 issued under a certain trust agreement dated May 2, 1908, between C. C. Bickel, et al., and the United States Trust Company, Trustee, secured by the pledge thereunder of the voting trust certificates in respect of 1,088 shares of such capital stock.

### Article Two.

1. Simultaneously with the delivery of the aforesaid securities to the savings bank, there will be held a meeting of the board of directors of the bank and except its president, James B. Brown, each of its direc-

tors will, in rotation, resign as directors, and each vacancy in the board thus caused will be filled by the appointment by the remaining directors of a person legally qualified to serve designated by the savings bank. The trust company incurs no personal obligation that such resignations will be made, but the savings bank shall be under no obligation whatever to take or to pay for any securities hereunder except as and when all said resignations have been made and such successors appointed.

## Article Three.

1. The savings bank binds and obligates itself to pay to the trust company for each share of capital stock of the bank represented by stock certificate, voting trust certificate in respect of stock, or covered by collateral trust bonds covering voting trust certificates in respect of stock under said trust agreement dated May 2, 1908, and so delivered by the trust company to the savings bank, the following sums of money, to-wit:

(a) Twenty-six ($26.00) dollars; and,

(b) The amount fixed by Messrs. John W. Barr, Jr., and H. C. Rodes as the value of the stock per share excluding franchise, good will or earning power.

2. The amount per share as fixed by Messrs. Barr and Rodes shall be endorsed at the foot of this agreement in substantially the following form:

Louisville, Ky., September 4, 1909.

Mr. Embry L. Swearingen, President,
    Kentucky Title Savings Bank & Trust Company,
        City.

My Dear Sir:—For some time past we have been engaged in investigating the assets of the First National Bank, of Louisville, Kentucky, as set forth in the report of the special examiner, James S. Escott. We have separate investigations of a large number of the items comprising the assets. We have discussed in detail with Mr. James B. Brown, President of the First National Bank, each item comprising the assets. We have had the active assistance, during our investigation, of National Bank Examiner, Percy H. Johnson.

The result of our investigations leads us to the belief that the assets of the First National Bank, aggregating ........................ set forth in the schedule marked

"A," attached to this letter, should, under proper management, produce not less than $250,000.00 in cash.

We beg to thank you for the valuable assistance you have rendered us in this matter.

Very truly yours,

(Signed)   H. C. Rodes,

John W. Barr, Jr.

3.  The savings bank will pay to the trust company upon receipt of the aforesaid securities, the sum of $40.00 with 5% interest from date for each share of stock delivered or represented or covered by the securities so delivered.

4.  Should Geo. M. Boone exercise his right to redeem or take up the voting trust certificates in respect of 272 shares of stock covered by the trust agreement dated May 2, 1908, or any part thereof, then to the extent of such redemption and out of the payment made by him to redeem, the savings bank shall be reimbursed at the rate of $40.00 with 6% interest from this date until the date of such redemption for each share of stock in respect of which voting trust certificates were so redeemed, and the balance of the money paid on such redemption shall be paid to the trust company.

5.  The collateral trust bonds shall be held by the savings bank uncancelled until such time as the voting trust certificates pledged thereunder are respectively delivered to the savings bank or redeemed by said Boone to the extent to which he is entitled to redeem; and then the collateral trust bonds shall be returned to the trust company or otherwise disposed of as shall best preserve to the makers thereof their respective rights as between each other for contribution.

6.  The payment of $26.00 per share shall be made upon the conditions as provided in article four hereof.

### Article Four.

The appraisers shall list the assets of the bank which they deemed to represent its capital stock, surplus and undivided profits and on the basis of which they appraised the value of the stock at $40.00 a share; and a copy of such list shall be attached hereto.

2.  An accurate account shall be kept of those assets and the amounts realized therefrom by the bank.

After October 1, 1910, no extension or renewal of any obligation included in said list of assets shall be

granted except with the consent of the liquidating committee hereinafter referred to.

Any real estate, stocks or bonds embraced in said list which remain unsold, on October 1, 1910, shall be sold within a reasonable time thereafter.

When there shall have been realized therefrom in cash or in such equivalent as the bank shall elect. to treat as cash the sum of approximately $245,000.00 with interest at 6% from September 4, 1906, the exact amount to be determined by National Bank Examiner, P. H. Johnston, and endorsed herein plus legal expenses incurred for such collection, then the balance of such assets remaining shall be deemed as set free by the reduction of capital stock for distribution among the shareholders of the bank; and at that time the savings bank shall pay to the trust company $26.00 per share with 6% interest thereon from September 3, 1909, for each share of stock represented by certificate or other security sold by the trust company to savings bank.

To the extent of the number of shares, if any, that shall, be redeemed by said Boone from under the collateral trust bonds the savings bank shall not be obligated to pay the $26.00 per share.

If there shall not be realized from said assets the said sum of approximately $245,000.00, plus said legal expenses, as aforesaid, the deficit shall be deducted from the $26.00 per share and interest payable by the savings banks to the trust company.

3.   The savings bank assigns and transfers without recourse of any kind or nature whatsoever to the trust company, all its present or prospective interest as shareholder in the bank, but only to the extent of the shares purchased under this contract in or to the said listed assets after the collection of said sum of approximately $245,000.00, plus the said legal expenses; and will when and as requested, execute such further assurances as may be necessary to effectuate this provision of this contract.

4.   Those assets after the payment of said sum of approximately $245,000.00, plus said legal expenses, shall be liquidated as provided in article five hereof for the equal pro rate benefit of all the shareholders of record of the bank as of the time of the reduction of the capital stock from $500,000.00 to $200,000.00, except that the proceeds of liquidation applicable as aforesaid to the

stock represented by the securities acquired hereunder by the savings bank shall go to the trust company and not to the savings bank or its transferees.

5. If there are any actual or contingent liabilities of any sort whatever of the bank, not appearing upon the bank's statement of its condition as of this date, or which were not considered by Messrs. Barr and Rodes in fixing their appraisement, and the bank shall hereafter in good faith pay or be compelled to pay them, then to the extent of such payment or payments the amount thereof shall be paid to or retained by the savings bank out of the $26.00 per share or out of such proceeds of liquidation.

### Article Five.

1. After the bank shall have realized from said listed assets the said approximate sum of $245,000.00, plus legal expenses, the remainder of such listed assets shall be trusted by the bank into the hands of a liquidating committee of shareholders to be appointed at the shareholders' meeting on September 4, 1909, for the benefit of the shareholders entitled thereto.

The liquidating committee shall in the first instance be composed of Messrs. J. B. Brown, Chairman; E. L. Swearingen, John W. Barr, Jr., and Geo. M. Boone.

2. Neither party hereto assumes any personal liability: (1) In respect of any matters the determination of which is lawfully not within their power; or, (2) to do or cause to be done anything which it has not the power to do or cause to be done.

At the meeting of the shareholders to be held on September 4, 1909, the savings bank will vote or permit to be voted the stock which it has purchased hereunder in favor of the following resolution if offered:

Resolved: That Messrs. J. B. Brown, Chairman; Embry L. Swearingen, John W. Barr, Jr., and Geo. M. Boone, be, and hereby they are, appointed a liquidating committee with full power to reduce to cash as speedily as possible and upon such terms as they deem best all the assets and interests to which the shareholders of the First National Bank may be entitled by reason of the reduction of the capital stock from $500,000.00 to $200,-000.00, and from time to time as said liquidating committee shall accumulate sufficient sums of money in their hands they shall declare the same out in the shape of a dividend of liquidation to the shareholders of record

at the time of said reduction of capital stock from $500,-000.00 to $200,000.00.

The savings bank will recommend to the board of directors of the First National Bank that it shall adopt the following resolution:

Resolved: That except with the consent of the liquidating committee appointed by the shareholders of the First National Bank at its meeting held on September 4, 1909, this bank will not sell except under judicial proceedings any securities nor compromise at less than the face value and interest, any note or other obligation which it embraced in the list of assets attached to a certain contract between the Fidelity Trust Co. and The Kentucky Title Savings Bank & Trust Co., dated September 4, 1909.

In testimony whereof, the parties hereto have caused these presents to be signed by their respective presidents and their corporate seals affixed, attested by their secretaries or cashiers this the 4th day of September, 1909.

FIDELITY TRUST COMPANY,
By JOHN W. BARR, President
Attest: J. C. MAHON, Secretary.
KENTUCKY TITLE SAVINGS BANK & TRUST COMPANY,
By EMBRY L. SWEARINGEN, President.
Attest: C. L. A. JOHNSON, Assistant Cashier.

We shall adopt, in referring hereafter in this opinion to the parties mentioned in the contract, the abbreviated terms employed in the contract.

The first thing to be noticed with reference to the contract is, that the only contracting parties are the trust company and the savings bank, and that it provides for a sale of shares of stock in the bank, not of the bank or its assets, and that the bank is not a party and its identity is in nowise altered or disturbed, although a majority of its stock, together with such control of the bank as is incident thereto, passed from the sellers to the buyer; next, that by the contract the savings bank, the purchaser, agreed, article three, section one, to pay the trust company, the seller, for the stock sold, $26.00, and the amount fixed by Messrs. Barr and Rodes as the value of the stock per share, but does not promise to pay anything more; that the price ultimately to be paid for the stock is not determined by the parties to the contract, but is to be thereafter fixed, by Messrs. H. C.

Rodes and Jno. W. Barr, Jr., whom we shall call the appraisers, at its actual value, excluding good will, which, it was agreed, was represented by the $26.00 per share mentioned in the contract; that in fixing the actual value of the stock, the appraisers were to set apart from the bank's assets, such part thereof as represented the bank's capital, surplus and undivided profits.

In order to understand what amount of the bank's assets represented its capital stock, surplus and undivided profits, and it is highly important that this be understood at the outset, we must refer to the bank's statement of assets and liabilities, which is in the record and admitted to be correct. From that statement, the bank had assets amounting to $3,974,860.82, and liabilities, other than capital stock, surplus and undivided profits, amounting to $3,443,941.39, and the amount of the bank's assets, which represented capital, surplus and undivided profits, was $530,919.43. But while the contract provided that the assets representing capital, etc., should be listed by the appraisers, it provided that from these amounts the sum of approximately $245,-000.00 should be realized, in order, as we think, to furnish the bank $200,000.00 of unimpaired capital stock. What was the purpose of the additional $45,000.00, provided for? An understanding of these figures is illuminating, because, by requiring to be set aside sufficient assets to produce $245,000.00 rather than $200,000.00, the required new capital stock, it is apparent that the assets of the bank representing capital stock, etc., viz.: $530,919.43, must produce more than capital stock; that it must make good a recognized impairment in the assets, representing other liabilities, to the extent of $45,000.00; in other words, the contract recognizes, not only that the capital stock, then $500,000.00, was so impaired that it must be reduced to $200,000.0, but also, that, in so reducing it, such assets as could be said to represent capital, surplus, etc., must produce, not only the contemplated $200,000.00, but an additional $45,-000.00, to recoup the assets held to cover liabilities other than capital, etc. As before stated, the contract directed the appraisers to list, only such assets as they deemed represented capital, surplus and undivided profits, and to do which, as we have seen, they were limited to assets, as carried on the bank's books, amounting to $530,919.43, and the contract further provided,

that the assessors, when they had made such a list, should attach to the contract their statement, and that Mr. Percy Johnson should endorse thereon the exact amount, estimated at $245,000.00, to be realized from such listed assets in order to provide an unimpaired capital of $200,000.00, after making good the bank's other liabilities. This is not expressly stated, but is the necessary conclusion from what is stated.

After completing their work, the appraisers filed a list of assets totaling $753,905.86, which they stated should produce $423,656.38 rather than approximately $245,000.00, and, in so doing, unintentionally furnished the basis of this action, for it is upon the assumption, that out of this list of $753,905.86 the bank was entitled to only $245,000.00 rather than $423,656.38 as stated by the appraisers, that appellee proceeds, and upon this assumption the chancellor rendered the judgment herein.

It is apparent that, in making a list of $753,905.86, the appraisers did not list assets representing capital, surplus and undivided profits, only, but included assets representing liabilities to creditors, to the extent their list exceeded the book value of capital, surplus and undivided profits, $530,919.43, that is $222,986.43, which necessarily represented assets held by the bank, not as capital and surplus, but for its creditors. Certainly, neither party to the contract had any right to these excess assets, because neither had any interest in or rights to any of the bank's assets, until its creditors were provided for. So, although it is apparent the appraisers did not make out just such a list as the parties, by their contract, contemplated, but included therein nearly a quarter of a million dollars' worth of the bank's assets, to which neither party had any sort of right, and over which they had no power to contract at all; yet the chancellor, by the judgment, would make the savings bank pay to appellee, the proportionate part that has been collected by the bank, of this entire $753,905.86, in excess of $245,000.00, that his number of shares, three hundred and twenty, bears to the entire number of shares, five thousand, in spite of the fact that neither party had the right, or attempted, to make any contract whatever with reference thereto, as these were the bank's assets, and the contract sold only shares of stock in the bank, on the basis of the value of assets representing only capital and surplus.

Manifestly, the contract had no such purpose, and no party in any way connected therewith, so contemplated. The contract shows that the parties thereto contemplated a list covering the capital stock, surplus and undivided profits, amounting to approximately $530,-000.00, but the appraisers made a list of over $753,-000.00, but in submitting this list, they attempted to, and did, correct its seeming error, by fixing the amount to be received by the bank, before participation by the stock sellers, at $423,656.38, instead of $245,000.00 as provided in the contract, and when this provision of their report is obserevd, it is apparent, they sought to accomplish the very result the parties desired they should accomplish, that is, to eliminate such assets as were of doubtful value, out of which to realize a sufficient sum in money to make the bank sound, and provide a capital of $200,000.00, which would make the stock worth $40.00 per share, the price to be paid by the savings bank, plus the $26.00, which represented good will and had no reference to the bank's assets and liabilities, except that the assets should equal the liabilities with a capital stock of $200,000.00; but in the event the value per share fixed by the appraisers did not reach $40.00, then the deficit to be adjusted out of the $26.00 per share, the only difference being, that when the contract was executed, this result was thought, by the parties, to be obtainable by realizing, from about $530,000.00, plus $45,000.00 of the assets to be set apart by the appraisers, the sum of $245,000.00, but was found by the appraisers, after a final appraisement of the assets, to be accomplished by realizing, from about $753,000.00 of its assets, the sum of $423,000.00. This difference resulted from the conclusion, by the appraisers, that $753,000.00, instead of $575,000.00, represented the assets that were of questionable value, as is explained fully by the affidavit of Mr. Percy Johnson, the National bank examiner, who assisted the appraisers in their work, and confirming their judgment in substance, although not in exact figures. Mr. Johnson, as the contract provided he should do, indorsed upon the schedule, that the amount to be realized from the appraisers' list of assets, of $753,000, must be $422,264.38, "in order to realize the capital stock of $200,000." So, before the sellers were to receive anything above $40.00 and $26.00 per share, which appellee has been paid, the bank's assets, of

proven value, must be sufficient to pay its liabilities and provide a capital stock of $200,000.00, which the contracting parties estimated could be done by realizing approximately $245,000.00, from such a list as the appraisers would prepare, but which the appraisers certified could be done, only, by realizing about $423,-000.00 from the list they did prepare; and this report was approved by Mr. Johnson. It is perfectly apparent, that the appraisers, and Mr. Johnson, acted in good faith and under the conviction that they were doing just what the contract provided they should do, and that was, to indicate how the bank could have sufficient assets to pay its liabilities to its creditors and have a capital stock of $200,000.00, before the sellers should have any further benefit, from the stock sold, out of the listed assets.

It must be remembered, that the appraisers, one of whom, Mr. Jno. W. Barr, Jr., was the president of the trust company, which, as one of the parties to the contract, negotiated the sale, as well as Mr. Johnson, were the agents of both sellers and purchaser, and that one party, as much as the other, is responsible for, and bound by, the manner in which they performed the work imposed upon them by the contract, and no objection having been made to the manner in which their work was done, by either party, neither of them can take any advantage of the fact that the list was not prepared in exact accord with the expectations of the parties. Both are equally bound by the acts of the appraisers and Mr. Johnson, and their actions and report must be construed and used to carry out the evident intention of the parties to the contract, and not as a basis for an advantage of one party over the other. So construed and employed, there is no doubt but that the list does attain the very purposes of the contract, and provide a workable method for a final adjustment of each party's rights under the contract, although, by the contract, that adjustment is made extremely difficult. But neither party can complain of the other, on that account.

Adopting the report of the appraisers, as approved by Mr. Johnson, as a substantial compliance with the provisions of the contract, it results, that $422,264.38 net, with interest from Sept. 4, 1909, must be collected by the bank, from the list of $752,705.86, the exact figures certified by Mr. Johnson differing slightly from those of

the appraisers, before the sellers and appellee can participate in a distribution of the proceeds of these assets, when such a distribution is made.    The proof, here, shows not only that the bank has not yet collected such an amount from the assets, but it also shows that no distribution of any of those assets has been attempted. The proof is conclusive, that the savings bank has never received one cent therefrom, in dividends or otherwise, and, that the bank still retains possession of all of these assets, and has never paid a dividend or made any distribution of any kind.    Therefore, appellee has failed to show any kind of a right to recover anything of the savings bank, and the judgment will be reversed with directions to dismiss the petition.

We do not decide, however, that appellee may not, in any event, recover under the contract, from the savings bank; but to do so, he must show that it has received, from the list of assets, an ascertainable benefit, over and above the $422,264.38 set apart by the appraisers to the bank.

Appellee's right to participate in the surplus of these assets is defined in article four, in which the savings bank assigns, "without recourse of any kind or nature whatsoever," to the trust company, for the benefit of the sellers, all of its present or prospective interest in the surplus of the listed assets, and appellee, and the others selling under the contract, and not the savings bank, own every beneficial interest therein, but how, or when, or whether this can be enforced is not before us for decision.

This action, as begun, seeks a recovery for a conversion of this surplus by the savings bank, but, no conversion being proven, that theory was abandoned, and an accounting attempted; but that attempt is equally futile, because the savings bank is shown, by the proof, not to have received, from these assets, anything for which it can account, and we can not concur in the chancellor's conclusion, that, by reason of its ownership of the majority of the bank's stock, the savings bank, under the contract, became a trustee for the sellers, to see that the bank carried out the provisions of the contract in reference to the excess listed assets, because the contract, in express terms, limits what the savings bank shall do in reference thereto, and the beneficial interest in these assets is assigned, without recourse, while the

contract provides, in article five, which deals with the distribution of these assets, that "neither party hereto assumes any personal liability: (1) in respect of any matters, the determination of which is lawfully not within their power; or, (2) to do or cause to be done anything which it has not the power to do or cause to be done;" and immediately after this provision, follows just what, and all that the savings bank contracted to do with reference to these assets. Whether or not the savings bank has observed or refused to observe this, the only provision for a distribution, does not appear from the record.

Counsel for appellee rely upon the theory, that he may hold the savings bank responsible for the failure of the bank to carry out the terms of the contract, to which it is not a party, because the directors and principal officers of the two institutions are the same persons, assuming that the fact, in effect, works a merger; but that position is clearly untenable, because the two concerns are as separate and distinct as though their officers were not identical. See Evansville R. Co. v. Ligon's Admr., 172 Ky. 631.

The contract is clear and explicit, that the savings bank agreed to pay to the sellers of the shares of stock in the bank, only $66.00 per share, which it has paid appellee, and, that it only assigned, without recourse, to these sellers, including appellee, all interest in the surplus of the assets listed by the appraisers, over and above the sum required therefrom to make the bank solvent with a capital stock of $200,000.00, which the appraisers and Mr. Johnson provided could be done by paying to the bank, from the list they actually made, the sum of $422,264.38, rather than the approximate sum of $245,000.00 from a list they did not make.

We have herein stated, that the contract contemplated the sale, by the sellers, of their stock, to the savings bank, at the real value of same, plus $26.00 per share, as should thereafter be fixed by the appraisers; and that the contract so provides, we think, is clear, from section four, the preamble of which is as follows:

"The savings bank is willing to purchase all the stock and voting trust certificates in respect of such stock represented or covered by the securities deposited with the trust company at the rate of $26.00 per share of stock, plus the value of the stock per share as the

same exists on this day as fixed and determined by an appraisement by John W. Barr, Jr., and H. C. Rodes; such appraisement not to include any sum for franchise, good will or earning power.''

If the appraisement had already been made, as counsel for appellee insist, then, it could have been incorporated in the contract, and the many provisions in reference thereto could have been avoided, and the quoted provision, that the savings bank would buy at $26.00 per share, plus the value of the stock per share, as the same exists on this day, as fixed and determined by an appraisement by John W. Barr, Jr., and H. C. Rodes; such appraisement *not to include* any sum for franchise, etc., was unnecessary. If the list was already complete, why did the contract state what it should not include? That the contract provided what the list was not to include, is sure evidence that it had not been completed, but was to be thereafter completed; and this is further apparent, from the fact that the sum needed to make the bank solvent, with a capital of $200,000.00, was approximated in some six places in the contract, rather than definitely stated, and its final determination left to Mr. Johnson, which he did by endorsement upon the appraisers' list, as finally made, and in substantial conformity therewith.

Wherefore, the judgment is reversed, with directions to dismiss the petition.