## First National Bank of Louisville v. Armstrong, et al.

(Decided November 20, 1917.)

Appeal from Jefferson Circuit Court
(Chancery Branch, First Division).

1. Banks and Banking—Sale of Shares of Stock—Liability of Bank.—
   Plaintiffs sold 303 shares of the capital stock of a national bank
   to a trust company for $40.00 per share and $26.00 for the good-
   will of the bank whose stock was sold, with the right of plain-
   tiffs to participate in the distribution of the assets of the bank
   then in liquidation for any sum collected by such liquidation in
   excess of $40.00 per share for the stock.  The bank was not a
   party to the contract, nor was the purchasing trust company
   any agent of it, nor did the trust company have any interest in
   the assets of the bank then being liquidated.  Held that the bank
   is not liable to plaintiffs on the contract of the sale of their
   stock for any part of the assets which it may have collected,
   although plaintiffs might have, as between themselves and the
   trust company, the right to participate in some of the assets
   collected by the bank; this because the bank was no party to
   the contract, but if it had been it could not bind itself to pay
   plaintiff, even if it had a right to purchase its own stock, any-
   thing by way of dividend or excess price for their stock over and
   above the actual value thereof, for to do so would imperil the
   interest of the bank's creditors.
2. Banks and Banking—Purchase of Stock.—A national bank cannot
   purchase its own stock unless it be to save a debt going to it,
   and then it may not hold same for a longer period than provided
   by law.

HELM BRUCE, ALEX. P. HUMPHREY, BRUCE & BULLITT and
HUMPHREY, MIDDLETON & HUMPHREY for appellant.

DODD & DODD for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, First National Bank of Louisville,
prior to the year 1909, and prior to the dates hereinafter
mentioned, was a banking corporation chartered and op-
erating under the laws of the United States providing
for the incorporation of national banks, with a capital
stock of $500,000.00, divided into shares of the par value
of $100.00 each.  The appellees and plaintiffs below
owned together 303 shares of the capital stock of the
bank.  Some time in the spring of the year mentioned it
was discovered by the Comptroller of the Currency that
the condition of the bank was very much dilapidated, its
assets being greatly impaired, and after investigation

through the comptroller's department, it was determined that one of three things must be done, viz., an assessment made upon the stockholders, a reduction of the capital stock to such a sum as would make the bank solvent and sound, or that the bank would be taken charge of by the comptroller and liquidated by him.

This situation produced much discussion among the stockholders and others interested in the bank's affairs, and resulted finally in a majority of the stockholders placing their stock with the Fidelity Trust Company, the name of which has been changed and is now the Fidelity & Columbia Trust Company, as trustee, for the purpose of selling the stock upon terms to be acceptable to the stockholders of the bank, with the view that the bank might be reorganized so as to meet the requirements of the Comptroller of the Currency, and at the same time to realize for the stockholders all that was possible on their stock. This was followed by a contract entered into between the trustee, to which we shall refer as the Trust Company, and the Kentucky Title Savings Bank & Trust Company, to which we shall refer as the Savings Bank; the date of that contract is September 4, 1909, and it is copied in full in the case of Kentucky Title Savings Bank & Trust Company v. Day, 174 Ky. 105, and neither it nor any of its parts will be copied herein. That contract was a sale by the Trust Company to the Savings Bank of a certain amount of the capital stock of the appellant, to which we shall refer as the Bank, on terms therein specified under which a reorganization of the bank was contemplated, and the stock sold by the Trust Company should be paid for upon the terms and at the times stated in the contract. The Trust Company had in its possession at that time the 303 shares of stock in the bank belonging to the plaintiffs, but upon the special terms that plaintiffs should ratify any disposition of the stock by the Trust Company before it should be binding on them.

After plaintiffs learned of the contract of September 4, 1909, they expressed dissatisfaction with its terms, and would not agree thereto, which resulted in the Trust Company executing to plaintiffs, on November 24, 1909, this writing:

"Louisville, Ky., November 24, 1909.

"The Fidelity Trust Company, the purchaser of 303 shares of the capital stock of the First National Bank of Louisville, Ky., in the names of John A. Armstrong

and Josephine P. Armstrong, for $40.00 per share and $26.00 per share for the goodwill of the First National Bank, recognizes our holding of the negotiable receipts for said stock with the right of John A. Armstrong and Josephine P. Armstrong to participate in the distribution of the assets of the First National Bank in liquidation for any sum collected in the liquidation of said bank in excess of 40% or $40.00 per share paid for said stock. Fidelity Trust Company, by Jno. W. Barr, Jr., President.''

In the manner pointed out by the contract of September 4, 1909, it was shown that in order to make the shares of stock in the bank worth 40 cents on the dollar, it would be necessary to collect from its doubtful assets a total sum of $422,264.38, which sum is made up of $200,000.00 for the capital stock of the bank at 40 cents on the dollar, and the balance of $222,264.38 for the purpose of liquidating the liabilities of the bank, which was the amount of liabilities over and above what its known good assets would pay.

After the contract of September 4, 1909, was executed, the capital stock of the bank was reduced to $200,000.00, which was afterward increased to $500,000.00 by subscription for new stock, and subsequently the capital stock was reduced to $300,000.00, with $200,000.00 surplus. The bank, after the reduction of the capital stock to $200,000.00, immediately began to collect out of the doubtful assets from which the $422,264.38 had to be realized, and at the time of the filing of this suit and when judgment was rendered it had *not collected a sufficiency with interest* from September 4, 1909, as the contract stipulated to realize that sum.

This suit was filed by plaintiffs, first against the Trust Company and the Savings Bank, to whom the former sold the stock, to recover their *pro rata* of the doubtful assets collected by the bank over and above $200,000.00, the sum necessary to make the stock in the bank worth 40 cents on the dollar, based upon the theory that the writing of November 24, 1909, gave them the right to participate in all the collections made of the doubtful assets of the bank over and above $200,000.00.

As the cause progressed, the bank was made a party-defendant, and it is sought to be made liable to plaintiffs upon the ground that the writing of November 24, 1909, executed by the Trust Company, was made for the use and benefit of the bank, which necessarily proceeds upon

the contention that the Trust Company was in some way the agent of the bank to purchase plaintiffs' stock.

The pleadings of the various defendants, including that of the bank, put in issue all of the contentions of the plaintiffs, and especially denied any liability under the writing or contract of November 24, 1909, and in another paragraph the bank relied upon the United States statute forbidding it to purchase its own capital stock, and further insisted that under the circumstances of its being wholly insolvent at the time, it was incompetent and illegal for it to agree to pay any of its stockholders any sum by way of dividend, or for other purposes as long as its assets were impaired so as to imperil its creditors and to in anywise prefer one stockholder over another. To the latter paragraphs of the bank's answer demurrers were sustained, to which it excepted.

The case was referred to a commissioner, with directions to ascertain and report certain facts, among which was the amount of collections which had been made from the doubtful assets of the bank over and above $200,-000.00. The commissioner reported that there had been collected from the list of doubtful assets of the bank up to the time of filing the report with interest, over and above the $200,000.00 necessary to make the bank stock worth 40 cents, the sum of $322,261.22. Various exceptions were filed to the report, but they were overruled, and the court gave judgment in favor of plaintiffs against the bank for 303/5000 of the excess collections above the $200,000.00, totaling the sum of $19,529.03, and to reverse that judgment the bank prosecutes this appeal.

At the threshold it may be stated that there is a wide divergence between counsel for plaintiffs and defendant as to the meaning and scope of the contract of November 24, 1909. It would be interesting to enter into that discussion and to settle the difference between the two contentions, but under the view we take of this case we do not find it necessary. We have very pronounced views upon the subject, illustrative of which is that if the contract is to receive the interpretation insisted upon by plaintiffs it would be an anomalous one indeed, since the result of it would be that the plaintiffs, if other stockholders were to share like them, would receive a sum sufficient to consume all of the surplus of the bank, and perhaps more than $100,000.00 of its capital stock.

Furthermore, to adopt that interpretation would result in plaintiffs surrendering nothing on account of the

impaired condition of the bank at the time they sold their stock, but on the contrary would be receiving a guarantee, and would actually be paid forty per cent. of their stock to be realized out of the first collections of the impaired assets of the bank; $26.00 per share besides, and their *pro rata* of all other collections made above the forty per cent. In other words, that they would get just what their stock might eventually be worth after all the impaired assets had been completely exhausted, and $26.00 per share in addition. But, however, anomalous such results might be, as we have said, we do not feel called upon just now to construe the contract of November 24, 1909, for the reason that under no view of the case can it be said that the bank was in anywise privy to that contract. Nowhere in the voluminous testimony does it appear that the transaction was any other than a selling of plaintiffs' stock either to the Trust Company, or a placing of their stock with that company as agent for the purpose of sale, which it sold to the Savings Bank.

It is insisted for the plaintiffs, however, that the bank knew of the terms upon which they sold their stock, and with this knowledge it accepted from the Trust Company the list of doubtful assets in the collection of which, above $200,000.00, plaintiffs are by this suit seeking to participate; and it thereby agreed to recognize plaintiffs' alleged right of participation and in this way agreed to the November contract, and thus obligated itself to carry out its terms.

The trouble here is that a corporation does not become a party to a contract by one of its stockholders whereby he sells his stock from the mere fact of having knowledge of the contract of sale and of its terms. Nor can the fact that the bank retained and collected the assets strengthen plaintiffs' case for the reason that they were always the property of the bank, neither the Trust Company nor the Savings Bank having anything to do with them or control over them. In collecting them the bank was doing only that which was its right and was its duty to do. The only figure which the assets cut in the transaction at all is to in some way measure the price which plaintiffs were to receive for their stock, and whatever interpretation might be placed upon the November contract the assets in question do not affect it in any way save and except to affect the price to be eventually paid for the stock. Just what a purchaser of the stock in the bank should pay for

it is no concern of the bank itself, and if the measurement of the price is to be affected by the assets (good or bad) of the bank, that is a subject which concerns only the parties to the purchase of the stock.

Furthermore, if the bank had signed the November contract, it then would not be liable for the cause of action here sued for, because it was at that time insolvent, and to have incurred the liability for which plaintiff contends, if enforceable, would have been a violation of section 5204 of the U. S. Revised Statutes, which reads:

"No association, or any member thereof, shall, during the time it shall continue its banking operations, withdraw, or permit to be withdrawn, either in the form of dividends or otherwise, any portion of its capital."

As we have seen, the capital of the bank was so imperiled at the time because of insolvent assets that its capital stock of $500,000.00 was worth far less than par, and to permit any of its stockholders to withdraw from the bank any sum above what might be necessary to keep the capital at par and the institution solvent, would be a plain violation of the Federal statute. This was so held in the case of McCann v. First National Bank of Jeffersonville, 131 Ind. 95, which is a case in many of its features almost on all fours with this one. In that case, in denying the right of the directors to make withdrawal of its assets to be paid to stockholders to the detriment of creditors, the court said:

"It must be remembered that the reduction in the capital stock of the bank was, in a sense, involuntary and was to meet an impairment of equal amount. It must be presumed that the Comptroller of Currency, in estimating and determining the amount of the impairment, considered all of the assets of the bank, and that his estimate was based upon what then appeared to be their value, making proper allowance for assets depreciated in value and for those regarded as valueless. The assets of a bank are held by it in trust (1) for the payment of its indebtedness, and (2) for the distribution among its stockholders of the surplus only, if any remaining. Morse, Banks, 706. Conceding, without deciding, that the stockholders of a national bank, the capital stock of which is intact, may voluntarily reduce its capital stock under that statute, for the purpose of withdrawing a portion of the investment, and may thereupon withdraw assets to an amount equaling the reduction, the question remains, can they take such action when the reduction is

involuntary, and is only made to an amount equaling an impairment in its capital? The right to withdraw assets in the one case would not necessarily involve the right to do so in the other. In the one case the reduction in the amount of its stock is made for the purpose of releasing and withdrawing a portion of the investment. In the other it is made because it is discovered that a corresponding amount of the investment has been lost, and thus already involuntarily withdrawn. There can be no voluntary withdrawal of any portion of the assets of a bank, when the effect of such withdrawal will be to impair the capital stock or endanger the security of its creditors. On the facts before us, it will be presumed that the reduced capital stock represented the actual value of the remaining assets. *Prima facie,* any further withdrawal of assets, whether of great or of little value, would result in still further impairment of the capital. In our opinion, the stockholders had no power to withdraw the assets in question, and no valid trust was created by the attempt to do so."

We find no case in conflict with that one, although plaintiffs rely upon the cases of Cogswell v. Second National Bank, 76 Conn. 252, afterwards appealed to the Supreme Court of the United States and reported in 204 U. S. 1, and Seely v. New York National Exchange Bank, 8 Daly 400. But an examination of those cases will show that the principles therein announced are both reasonable and logical and should be applied to similar states of fact, but the facts of each are so dissimilar to those with which we are dealing in the instant case as to render the cases of no assistance to the plaintiffs here. In each of them the banks were recognized solvent institutions. The action proposed to be taken was a voluntary reduction of the capital stock of the bank, and the question of withdrawal of assets so as to impair the solvency of the bank was not in anywise involved.

Furthermore, it is incompetent for a national bank, such as the defendant, to purchase its own stock, unless necessary to save a debt going to it. 7 Corpus Juris 767; U. S. Revised Statutes, section 5201; Wallace v. Hood, 89 Federal Reporter 11; Same v. Same, 97 Federal Reporter 983. An agreement to purchase its own stock except for the purpose of saving a debt cannot be enforced. Corpus Juris, *supra;* Atwater v. Stormberg, 75 Minn. 277; Burrows v. Niblack, 84 Federal Reporter 111. Neither can a national bank acquire a lien upon its own stock as pledgee to secure a debt owing to it. Louisville

Second National Bank v. National State Bank, 10 Bush 367; Buffalo Third National Bank v. Buffalo German Insurance Company, 193 U. S. 581, and 7 Corpus Juris 767.

Wherefore, the judgment is reversed with directions to proceed in accordance with this opinion.